1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| ADRIAN MORIEL, | No. SA CV 17-2215-PLA |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| NANCY BERRYHILL, DEPUTY COMMISSIONER OF OPERATIONS FOR THE SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## I.

## PROCEEDINGS

Plaintiff filed this action on December 20, 2017, seeking review of the Commissioner's[1] denial of his application for Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before a Magistrate Judge on December 21, 2017, and January 10, 2018.

---

[1] On March 6, 2018, the Government Accountability Office stated that as of November 17, 2017, Nancy Berryhill's status as Acting Commissioner violated the Federal Vacancies Reform Act (5 U.S.C. § 3346(a)(1)), which limits the time a position can be filled by an acting official. As of that date, therefore, she was not authorized to continue serving using the title of Acting Commissioner. As of November 17, 2017, Berryhill has been leading the agency from her position of record, Deputy Commissioner of Operations.

Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on July 26, 2018, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Submission under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on April 3, 1976. [Administrative Record ("AR") at 385, 389, 781.] He has no past relevant work. [AR at 781, 828.]

On March 29, 2010, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that he has been unable to work since April 1, 1995. [AR at 197, 898.] At the July 28, 2011, hearing, plaintiff withdrew his claim for DIB. [AR at 186-87.] On December 23, 2011, plaintiff's SSI claim was denied by an Administrative Law Judge ("ALJ"). [AR at 197-211.] The Appeals Council remanded the matter with instructions. [AR at 214-17.] A new hearing before the same ALJ was held on February 25, 2014, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 44-101.] A medical expert ("ME") -- Craig C. Rath, Ph.D., a clinical psychologist -- and a vocational expert ("VE") also testified. [AR at 48-77, 93-97.] On April 8, 2014, the ALJ issued a decision again concluding that plaintiff was not under a disability since March 29, 2010, the date the application was filed ("2014 Decision"). [AR at 222-37.] Plaintiff requested review of the ALJ's decision by the Appeals Council, which was denied on July 25, 2015. [AR at 1-5.] Plaintiff then filed an action with this Court in case number SA CV 15-1356-PLA, and on August 3, 2016, this Court remanded the matter for further proceedings. [AR at 896-925.] On July 25, 2017, a remand hearing was held before a different ALJ, at which time plaintiff again appeared represented by an attorney and testified on his own behalf. [AR at 806-61.] A different medical expert ("ME") -- Joseph M. Malancharuvil, Ph.D., a clinical psychologist -- and a different VE also testified. [AR at 808-28, 828-31.] On October 18, 2017, the ALJ issued a decision again concluding that plaintiff was not under a disability since March 29, 2010, the date the application was filed. [AR at 769-892.] At that time, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.984.

This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Id. (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting

42 U.S.C. § 423(d)(1)(A)).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lounsburry v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsburry, 468 F.3d at 1114. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2. Lounsburry, 468 F.3d at 1114. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

4

1  **B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

2  　　　　At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

3  March 29, 2010, the application date.  [AR at 772.]  At step two, the ALJ concluded that plaintiff

4  has the severe impairment of mood disorder, not otherwise specified, with major depressive

5  symptoms.[2]  [Id.]   He concluded that plaintiff's hepatis C and dyslipidemia are non-severe

6  impairments, and that although plaintiff had been diagnosed with polysubstance abuse or

7  polysubstance dependence, the record lacked "objective evidence of a maladaptive patter[n] of

8  substance use during the relevant period."  [Id.]  At step three, the ALJ determined that plaintiff

9  does not have an impairment or a combination of impairments that meets or medically equals any

10  of the impairments in the Listing.  [Id.]  The ALJ further found that plaintiff retained the residual

11  functional capacity ("RFC")[3] to perform a full range of work at all exertional levels as follows:

12  　　　　[He can perform] moderately complex tasks, excluding fast paced work such as
　　　　rapid assembly; excluded from jobs that involve safety operations (taking care of the
13  　　　　health and welfare of others); and is precluded from working around heavy moving
　　　　machinery or fast moving machinery.
14

15  [AR at 774.[4]]  At step four, based on the testimony of the VE, the ALJ concluded that plaintiff has

16  no past relevant work experience.  [AR at 781, 828.]  At step five, based on plaintiff's RFC,

17  vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant

18  numbers in the national economy that plaintiff can perform, including work as an "industrial

19  cleaner" (Dictionary of Occupational Titles ("DOT") No. 381.687-018), as a "laundry laborer" (DOT

20

21  　　　[2]    In the 2014 Decision, the previous ALJ found plaintiff had the severe impairments of major
22  depressive disorder, recurrent; and polysubstance dependence.  [AR at 225.]

23  　　　[3]    RFC is what a claimant can still do despite existing exertional and nonexertional
limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
24  three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
25  1151 n.2 (9th Cir. 2007) (citation omitted).

26  　　　[4]    In the 2014 Decision, the ALJ found that plaintiff retained the ability to perform the full range
27  of work at all exertional levels but with the following non-exertional limitations:  "3 to 5 step
moderately complex tasks; object oriented, so no working with the general public; avoid stressful
28  environments such as taking complaints; and avoid intrusive supervision."  [AR at 229.]

5

No. 361.687-018), and as a "cleaner II" (DOT No. 919.687-014). [AR at 782.] Accordingly, the ALJ determined that plaintiff was not disabled at any time since March 29, 2010, the date the application was filed. [AR at 782.]

## V.

## **THE ALJ'S DECISION**

Plaintiff contends that the ALJ erred when he: (1) determined that the testimony of Dr. Malancharuvil, the ME, constituted substantial evidence; (2) considered the opinion of plaintiff's treating psychiatrist, Bruce Appelbaum, M.D.; (3) considered the third-party hearing testimony of plaintiff's sister, Marina Diaz, and the Third-Party Function Reports of plaintiff's social worker, Sara Macaulay, and his friend, Francisco Cedillo; (4) failed to properly consider plaintiff's subjective symptom testimony; and (5) failed to properly consider plaintiff's Global Assessment of Functioning ("GAF") scores. [JS at 2.] As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    MEDICAL OPINIONS

### 1.    Legal Standard

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.[5] The Ninth Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given

_____

[5]    The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) shall apply. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016). However, the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed plaintiff's claim pursuant to the treating source rule set out herein. See also 20 C.F.R. § 404.1527 (the evaluation of opinion evidence for claims filed prior to March 27, 2017).

'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record.'" Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)) (second alteration in original). Thus, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison, 759 F.3d at 1012 (citing Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1221, 1227 (9th Cir. 2009)); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Trevizo, 871 F.3d at 675 (citing Ryan, 528 F.3d at 1198). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. (citing Ryan, 528 F.3d at 1198). When a treating physician's opinion is not controlling, the ALJ should weigh it according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray, 554

F.3d at 1221, 1227 (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### 2. Dr. Malancharuvil

Dr. Malancharuvil testified at the hearing. [AR at 808-28.] He opined that plaintiff has "an identifiable and physical condition on (INAUDIBLE) and put it as a border [sic] disorder, not otherwise specified and with symptoms (INAUDIBLE). And there is a history of substance, substance dependence and he is considered to be diagnosed with it and suggesting that for five years he had been sober so I have considered free of the effects of drugs or alcohol over the last five years." [AR at 809.] He found no other impairments. [Id.] Dr. Malancharuvil further determined that plaintiff has mild limitations in his ability to understand, remember, and apply information; interact with others; maintain concentration persistence, or pace; and manage himself in work settings. [AR at 810.] He concluded that "the overall exam is bordering on non-severe at this point, but I wouldn't [sic] consider as severe and give him the following limitations":

> That he would (INAUDIBLE) to moderately complex tasks in a relatively routine setting with the exclusion of highly fast-paced work such as working on a rapid assembly line. He also is precluded from safety-related operations such as taking charge of other people's safety, and I'm also going to preclude him from operating hazardous or fast-moving machinery. . . . Exhibit 14F [AR at 645-49] suggests a diagnosis of depression with moderate limitations for work. He was being (INAUDIBLE) for medication about three months suggesting that he was maintaining well and certainly supported by his mental status. He's essentially fair to good, page 2 of that exhibit [but see AR at 645[6]], and that is consistent across the records. Exhibit 39F [AR at 1655-56] suggests that he's moderately stable and he's functioning adequately with the medications and whatever other treatment they are giving. Exhibit 37F, page 2 [AR at 1615], mental status is okay. Mild (INAUDIBLE) overall. Exhibit 36F [AR at 1572-1613], a positive role, laughing and interacting with his friends and companions, and he is generally reported feeling good. Exhibit 31F

---

[6] As discussed herein, Exhibit 14F, Dr. Appelbaum's June 17, 2011, Mental Assessment, does *not* ever indicate that plaintiff was "fair to good," and most of plaintiff's work abilities as assessed by Dr. Appelbaum were determined to be moderately severe to severely impaired. [AR at 645-49.]

[AR at 1436-41], is a psychiatric evaluation in 2015, December, and his mental status is intact and the doctor suggests possible bipolar disorder, not otherwise specified, suggesting that he has a mood disorder consistent with the overall diagnosis of mood disorder, not otherwise specified. . . . And so the overall impression -- also, you know, he was in Exhibit 2F [AR at 545-58], on exam, there was no document but his mental status is okay, page 20. He's doing well. And page 51, mental status is essentially intact. So the overall impressions, especially in the current treatment suggests that he's stable and he's minimally depressed and he's maintained well with medication and he is functional as was suggested in December of '15 and December of 2015 he had a psychiatric evaluation. There is [sic] no contradictions in the record. [Plaintiff] should be able to function within the limits I opined to you. . . . His overall diagnosis is a mood disorder, not otherwise specified, with major depressive symptoms at mild, moderate levels at certain times. . . . He was diagnosed with a mood disorder, not otherwise specified in Exhibit 2F and then later on, they made the depressive diagnosis and the psychiatric evaluation gives him a bipolar diagnosis. So we have three mood disorder diagnoses. And overall suggestion that there was probably the term would be a mood disorder, not otherwise specified. . . . So therefore, I would suggest the best way to combine, I only testified that combined together, that means we have a mood disorder, which (INAUDIBLE) and some regular (INAUDIBLE). That's where we are in conclusion. Reading the entire record together to make sense. But if you want, we can add all the three diagnoses. We cannot (INAUDIBLE) and saying the facts, this all comes under 12.04.

[AR at 810-12, 825.] Among other things, plaintiff's counsel attempted to question Dr. Malancharuvil regarding his testimony that Exhibit 2F (AR at 545-58) reflected that plaintiff was diagnosed with a mood disorder, not otherwise specified. [AR at 825-28.] Counsel stated that the diagnosis of "mood disorder, not otherwise specified" did not appear in Exhibit 2F, which instead reflected "the diagnosis major depressive disorder," and suggested to Dr. Malancharuvil that "in the entire record, none of the treating physicians ha[s] diagnosed [plaintiff with] mood disorder, not otherwise specified." [AR at 826; but see AR at 556.] Dr. Malancharuvil responded by stating the following: "I already told you that at Exhibit 2F, which was after 2010, the only not otherwise specified diagnosis, page four, 31F, bipolar not otherwise specified." [AR at 828.]

The ALJ gave Dr. Malancharuvil's testimony "greatest weight":

Dr. Malancharuvil testified based on a review of the entire medical file and following that review and extensive questioning from the undersigned [ALJ] and [plaintiff's] attorney representative, noted [plaintiff's] purported polysubstance abuse/ dependence is not material to the consideration of [plaintiff's] impairments. He also testified [plaintiff's] symptoms are generally controlled and that [plaintiff's] overall presentation is bordering on non-severe. He testified that [plaintiff] would be capable of moderately complex tasks so long as they were not performed in a fast-paced work setting and that he engaged in no safety related operations, and so long as he did not operate fast moving or hazardous machinery.

As discussed above, [plaintiff] generally presents as "doing well" and that *his most*

*recent presentation is stable.* Furthermore, [plaintiff] only required adjustments of his medications around 25% of the time but also . . . has very long periods of about 2 years with no changes or adjustments in his medications. As such, the testimony of Dr. Malancharuvil is consistent with the objective medical evidence of record. Furthermore, his knowledge of the regulations and policies governing social security disability cases gives him additional insight into this process that the other sources did not have. Furthermore, he was the only medical professional to review the entire file and his testimony was subject to intense scrutiny during the hearing from [plaintiff's] attorney representative.

[AR at 780 (emphasis added).]

Plaintiff states that the ALJ cut-off counsel's cross-examination of Dr. Malancharuvil. [JS at 3 (citing AR at 828).] He contends, therefore, that the ALJ's statements that Dr. Malancharuvil was subject to extensive questioning from plaintiff's attorney and that "his testimony was subject to intense scrutiny during the hearing from [plaintiff's] attorney representative," were not accurate. [JS at 2.] Plaintiff states that if he had been permitted to clear up Dr. Malancharuvil's testimony, it could have been better determined whether Dr. Malancharuvil was "overemphasizing the most recent medical reporting," as evidenced by his statement that "'current treatment suggests' that [plaintiff] is functional." [JS at 3 (citing AR at 811).] Additionally, although Dr. Malancharuvil repeatedly testified as to the diagnosis contained in Exhibit 2F, plaintiff submits that diagnosis was not reflected in that Exhibit and the pages of that Exhibit referenced by Dr. Malancharuvil, i.e., pages 20, 30, 50, and 51, do not exist, because Exhibit 2F "only has 15 pages." [Id.] Accordingly, plaintiff submits that Dr. Malancharuvil's testimony was not supported by substantial evidence and the ALJ's termination of counsel's examination of him "did not allow for a full and true disclosure of the facts." [Id.]

Defendant contends that the ALJ "permitted extensive cross-examination and only ended it after six warnings that Plaintiff's counsel should not cut off the witness while he was trying to testify." [JS at 4 (citing AR at 816, 818, 820, 821, 822, 826-27).] Defendant notes that the ALJ deemed that plaintiff's counsel "was needlessly muddling the record during his cross-examination." [JS at 4-5 (citing AR at 820, 823).] Defendant argues that plaintiff does not have an unlimited right to cross-examination, and has failed to show how he was harmed by the ALJ's decision to terminate the examination. [JS at 5 (citations omitted).] Defendant states that contrary to plaintiff's argument, Dr. Malancharuvil's testimony regarding plaintiff's functional limitations was

based on his consideration of plaintiff's overall condition, not just his current condition:

> Plaintiff alleges that Dr. Malancharuvil's testimony was deficient because he overemphasized Plaintiff's current condition and improperly identified one exhibit. In fact, Dr. Malancharuvil testified that the "overall impression[], *especially in the current treatment* suggests that [Plaintiff is] stable and he's minimally depressed and he's maintained well and he is functional.

[JS at 5 (citing AR at 811) (brackets in original) (emphasis added).] Defendant also submits that Dr. Malancharuvil's opinion was consistent with the June 2010 opinion of the consultative examiner Ernest A. Bagner III, M.D., who found no limitations for simple tasks, mild limitations interacting with others, maintaining concentration and attention, and completing complex tasks; and mild to moderate limitations handling normal stresses at work and completing a work week without interruptions. [JS at 5-6 (citing AR at 590-93).] With respect to Dr. Malancharuvil's incorrect citation to Exhibit 2F relating to plaintiff's condition, defendant merely notes that the exhibit pertained to plaintiff's condition around 2010 and that "Dr. Bagner's opinion supports Dr. Malancharuvil's opinion that Plaintiff was as limited as Dr. Malancharuvil testified throughout the relevant time period, and cures any alleged deficiency in Dr. Malancharuvil's testimony." [JS at 6.]

Plaintiff responds that if, as Dr. Malancharuvil suggests, current treatment notes reflect that plaintiff's condition has improved, "then this does not invalidate [treating physician] Dr. Appelbaum's opinion [of June 7, 2011, showing primarily moderately severe to severe work-related limitations] at the time it was issued[,] [which] would suggest that [plaintiff] was disabled previously and his condition has improved to the point that he is no longer disabled." [JS at 7.] He notes that defendant failed to address the fact that Dr. Malancharuvil testified about information and documents in Exhibit 2F that do not exist. [JS at 7-8.] He contends that it was error for the ALJ to give the ME's opinion "greatest weight" "when at least one exhibit allegedly relied upon by the ME does not exist." [JS at 8.] He further contends that whether Dr. Bagner's opinion supported the ME's opinion is not relevant to the issue of whether the ME's opinion was supported by substantial evidence or whether additional information could have been elicited upon cross-examination. [Id.]

In large part, the documents cited to by Dr. Malancharuvil do not reflect what he says they

reflect. For instance, Dr. Malancharuvil describes Exhibit 14F [AR at 645-49], Dr. Appelbaum's June 17, 2011, Mental Assessment, as demonstrating "moderate limitations for work," and a mental status that was "essentially fair to good." In fact, that assessment does not indicate "fair to good" anywhere within it, and only 3 of the 20 work abilities were rated as moderate: plaintiff's ability to remember and carry out very short and simple instructions, and to ask simple questions or request assistance. [AR at 645, 646, 647.] *Every other work-related ability* (17 out of 20) was described as either moderately severe ("[a]n impairment which seriously affects ability to function") or severe (an "[e]treme impairment of ability to function"). [AR at 645-48.]

Dr. Malancharuvil's "discussion" of other exhibits is similarly flawed. For instance, Exhibit 39F [AR at 1655-56], a December 23, 2016, treatment note, which Dr. Malancharuvil suggested reflected that plaintiff was "moderately stable" and "functioning adequately," indicated that plaintiff's insight, memory, concentration, and judgment were fair, and, while he was "stable overall," he "continues to function at baseline" and his medications were corrected. [AR at 1655.] Exhibit 37F [AR at 1614-18], which Dr. Malancharuvil described as reflecting that plaintiff's "mental status is okay," was the October 7, 2016, initial evaluation conducted by Hailong Vu, M.D. Dr. Vu explained to plaintiff that he was transitioning to a lower level of regular outpatient psychiatry, and noted that "[s]hould patient show incapability to attend regular outpatient, will transition him back to FSP [full service partnership care]." [AR at 1615.] Dr. Vu's evaluation also included the results of a depression screening that reflected that more than half the days plaintiff has little interest or pleasure in doing things, and moves or speaks slowly such that other people noticed; and nearly every day he feels down, depressed or hopeless; has trouble sleeping; feels tired; feels bad about himself; and has trouble concentrating on things. [AR at 1614.] He also noted fair concentration, memory, insight, and judgment. [AR at 1618.] Dr. Vu diagnosed plaintiff with a major depressive disorder, recurrent episode, moderate. [AR at 1617.] Exhibit 36F [AR at 1572-1613], treatment notes from plaintiff's outpatient group counseling, were described by Dr. Malancharuvil as reflecting that plaintiff took "a positive role, laughing and interacting with friends and companions." While this information is presented in one March 12, 2014, treatment note [AR at 1573], other notes reflect that plaintiff was hesitant to make any decisions, and was struggling to do anything

that would support positive self-esteem or coping skills [AR at 1575]; had been "feeling 'down' and hasn't really wanted to do anything" [AR at 1577]; wanted to increase his coping skills "because he is feeling pretty down right now" [AR at 1579]; stated that "he hasn't been 'doing much'" [AR at 1581]; was "able to laugh in the session" [AR at 1583]; had been feeling down and stated it had been a struggle "to get himself out of the house more" [AR at 1585]; felt irritated and angry around his peers and walked away from them [AR at 1587]; had not felt like going anywhere and had been staying home [AR at 1589]; reported that he was in good spirits and had been hanging out with his family more to distract himself from his anxiety and depression [AR at 1593]; felt emotional but in a "good way" [AR at 1599]; reported feeling "manic" and touching his nose in the same spot all the time, which concerned his family members [AR at 1601]; reported he wanted to isolate himself in his room because it is a safe place and stated that it is hard to leave the house because he becomes anxious, and he does not see his children or grandchildren because of his isolation and anxiety [AR at 1603]; reported that he does not participate in groups and misses appointments because he becomes anxious when he has to take the bus and anxious and paranoid when he leaves the house [AR at 1605]; had not been attending group because he is paranoid about leaving the house where he feels comfortable and safe [AR at 1607]; and reported that he becomes anxious around strangers or large groups of people.  [AR at 1611.]  In one note, plaintiff's counselor noted that plaintiff does not have insight into his isolation behaviors.  [AR at 1609.]  In short, Exhibit 36F reflects far more than the one meeting where plaintiff took a positive role, some of which was positive, but much of which did not reflect a "positive role."  Finally, Exhibit 2F [AR at 545-58], the exhibit upon which Dr. Malancharuvil heavily relied, treatment notes from College Community Services, does not contain several of the pages that Dr. Malancharuvil said it contained.  Additionally, although the diagnosis at plaintiff's initial visit to College Community Services in Exhibit 2F does reflect "Mood Disorder NOS" [AR at 556] as stated by Dr. Malancharuvil, every other treatment note after that visit reflected major depressive disorder, recurrent, unspecified.  [AR at 545-55.]

Furthermore, plaintiff's suggestion that Dr. Malancharuvil may have been overemphasizing the most recent treatment notes is supported by the ALJ's statement that plaintiff's "most recent

presentation is stable" and, "[a]s such, the testimony of Dr. Malancharuvil is consistent with the objective medical evidence of record." [AR at 780.]

Based on the foregoing, the Court agrees that the ALJ erred in giving Dr. Malancharuvil's opinion "greatest weight." Remand is warranted on this issue.

### 3. Dr. Appelbaum

On June 27, 2011, Dr. Appelbaum completed a Mental Assessment in which, as described above, he determined that 3 of the 20 work abilities assessed were moderately impaired, defined as "[a]n impairment which affects but does not preclude ability to function": plaintiff's ability to remember and carry out very short and simple instructions, and to ask simple questions or request assistance. [AR at 645, 646, 647.] Every other work-related ability (17 out of 20) was described as either moderately severe ("[a]n impairment which seriously affects ability to function") or severe (an "[e]treme impairment of ability to function"). [AR at 645-48.] On March 11, 2014, Dr. Appelbaum stated that he had reviewed plaintiff's treatment records since June 27, 2011, and that his "mental functional capacity remains substantially the same as noted on the Mental Assessment form I completed on June 27, 2011." [AR at 765.]

The ALJ gave Dr. Appelbaum's opinion "little weight":

> Dr. Applebaum [sic] completed a check-the-box questionnaire in June 2011 that was reaffirmed by a letter from March 2014. In the initial questionnaire, Dr. Applebaum [sic] noted [plaintiff's] functioning was moderately severe or severe in 17 of the 20 areas considered. . . . The ratings given by Dr. Applebaum [sic] are not supported by his own treatment records. Specifically, as discussed above, in 75% of the visits with Dr. Applebaum [sic], [plaintiff's] medications were continued unchanged and even when [his] medications were changed [he] still stated he was "generally doing well" but with some increase in acute symptoms that necessitated an adjustment in his medications. It is reasonable to conclude [plaintiff's] treatment with Dr. Applebaum [sic] would have been more invasive with additional treatment modalities or the use of additional medications with more frequent changes if [plaintiff's] impairments were as significant as alleged in this report. However, as discussed above, [plaintiff] was not that intensive as [his] impairments are generally stable.

[AR at 778 (citations omitted).]

Plaintiff contends that because, as discussed in the previous issue, Dr. Malancharuvil's opinion was not entitled to more weight than a treating physician's opinion, Dr. Appelbaum's

opinions can only be rejected by proper consideration of the treating relationship, frequency of examination, nature and extent of treatment, or supportability. [JS at 9 (citing <u>Trevizo</u>, 871 F.3d at 676).] He submits that the failure of the ALJ to address these factors, "alone warrants remand." [<u>Id.</u> (citing <u>Trevizo</u>, 871 F.3d at 676).] Plaintiff also argues that the ALJ's reasons for discounting Dr. Appelbaum's opinion were not legally sufficient. He submits that the ALJ impliedly rejected the opinion because it was in a "check the box" format, and ignored the treatment notes other than to the extent that they did not show a change in medications. [JS at 18-20.] He suggests that even if the later treatment notes showed that plaintiff's condition had improved, "this does not invalidate Dr. Appelbaum's opinion at the time it was issued . . . [but] would suggest that [plaintiff] was disabled previously, and his condition has improved to the point he is no longer disabled." [JS at 19.]

Defendant notes that as the ALJ determined, plaintiff saw Dr. Appelbaum 62 times between September 2009 and January 2016 "and only adjusted or changed his medications 16 times during this six-and-a-half year period." [JS at 14 (citing AR at 776).] Defendant states that it was reasonable for the ALJ to conclude, therefore, "that if Plaintiff's impairments were as significant as Dr. Appelbaum opined, his treatment 'would have been more invasive with additional treatment modalities or the use of additional medications with more frequent changes.'" [<u>Id.</u> (citing AR at 778).] Defendant argues that Dr. Appelbaum "did nothing 75% of the time," "which shows Dr. Appelbaum was sufficiently satisfied with Plaintiff's progress on his existing medications," which, in turn, is supported by Dr. Appelbaum's many treatment notes that described plaintiff as "generally doing well." [JS at 14-15 (citations omitted).] Defendant further argues that "even when Plaintiff complained of symptoms, he still reported he was 'generally doing well.'" [JS at 15.] Because of this, the ALJ "reasonably took Dr. Appelbaum's own treatment notes at face value and determined that those notes, rather than Dr. Appelbaum's check-box opinions, more accurately described Plaintiff's functioning during the relevant period." [<u>Id.</u>]

An ALJ is "not entitled to reject the responses of a treating physician without specific and legitimate reasons for doing so, even where those responses were provided on a 'check-the-box' form, were not accompanied by comments, and did not indicate to the ALJ the basis for the

15

physician's answers." <u>Trevizo</u>, 871 F.3d at 677 n.4.  Thus, to the extent the ALJ discounted Dr. Appelbaum's opinion because it was in a check-the-box form, he still needed to provide specific and legitimate reasons to discount that opinion.

Here, the ALJ rejected Dr. Appelbaum's opinions because they were not supported by his treatment records.  The ALJ supported this finding, in part, with a calculation that during 75% of plaintiff's treatment visits, Dr. Appelbaum did not change plaintiff's medications.  [AR at 776, 778.] As noted by the ALJ, plaintiff saw Dr. Appelbaum 62 times for monthly visits from September 2009 through January 2016 -- an approximately 75-month period.  [AR at 776.] He then calculated that at the 62 treatment visits with Dr. Appelbaum, plaintiff's medications "were only changed on sixteen (16) occasions," or at 25% of the treatment visits.  [AR at 776, 778.] The ALJ provided a narrative describing each of the medication changes between September 2009 through January 2016, which reflected a few longer periods when there were no changes (February 2011 through April 2012; August 2013 through August 2014; and March 2015 through January 2016).[7]  [AR at 776.] From this, the ALJ found that it was reasonable to conclude that Dr. Appelbaum would have provided "more invasive" treatment with "additional modalities" or "additional medications with more frequent changes" if plaintiff's impairments were as significant as he alleged in his report. [AR at 778.] However, the ALJ did not state the "more invasive treatment," "additional modalities," or "additional medications" that would be appropriate for the level of impairment alleged by Dr. Appelbaum.  The failure of a treating physician to recommend a more aggressive course of treatment, without more, "is not a legitimate reason to discount the physician's medical opinion about the extent of disability."  <u>Trevizo</u>, 871 F.3d at 677.  Moreover, based on the ALJ's own statistics, while plaintiff's medications were unchanged for approximately 36 months of the total 75-month period, this means that the 16 medication changes were made during the remaining 39

<hr>

[7]     These three periods without medication changes -- 14 months, 12 months, and 10 months respectively -- fail to support the ALJ's statement that there had been "very long periods of about 2 years with no changes or adjustments in [plaintiff's] medications."  [AR at 776.]

months, or every 2.5 months during those periods.[8]  The ALJ's statistics, and his speculation that plaintiff would have been treated more aggressively if his impairments were as severe as alleged by Dr. Appelbaum, simply are not legitimate reasons for discounting Dr. Appelbaum's opinions.

Neither is the fact, that it was reported at treatment visits that plaintiff was "generally doing well" or was "stable," a specific and legitimate reason for rejecting Dr. Appelbaum's opinions. Garrison, 759 F.3d at 1017 ("Cycles of improvement and debilitating symptoms are a common occurrence [with mental health issues], and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.").  In fact, a notation that a plaintiff is "generally doing well," by itself, does not contradict a treating physician's opinion of a plaintiff's functional limitations.  See, e.g., Perez v. Astrue, 2009 WL 3011647, at *13 (E.D. Cal. Sept. 17, 2009) (noting that "fairly stable" and "doing well" are relative terms); Sirrine v. Comm'r of Soc. Sec., 2009 WL 1346258, at *3 (D. Or. May 13, 2009) ("Although the notation 'doing well' appears in the [physician's treatment] notes, this can be a relative term").  As noted by plaintiff, many of these same notes also reflect ongoing symptoms, which the ALJ ignored. [JS at 19.]  And, further demonstrating the relative nature of the term "generally doing well," the ALJ admitted that "even when [plaintiff's] medications were changed [he] still stated he was 'generally doing well' but with some increase in acute symptoms that necessitated an adjustment in his medications." [AR at 778.]  This reason for rejecting Dr. Appelbaum's opinions was rejected by the Court when it assessed plaintiff's previous disability determination and found to be unsupported by substantial evidence [AR at 915-16], and it fares no better here.

Furthermore, the error was not harmless.  When plaintiff's counsel asked the VE whether an individual with the severe limitations assessed by Dr. Appelbaum would be able to perform

---

8  Even if there had not been periods where there were no medication changes, the ALJ did not explain how he concluded that a medication change at 1 of every 4 monthly visits over a 75-month (i.e., more than six-year) period was insignificant.

work,[9] the VE responded that there would be no jobs available that exist in significant numbers in the national economy. [AR at 831.] Thus, if Dr. Appelbaum's testimony had been given controlling weight, plaintiff would be considered disabled.

Finally, "the ALJ's outright rejection" of Dr. Appelbaum's opinion was legally erroneous because "the ALJ erred by failing to apply the appropriate factors in determining the extent to which the opinion should be credited." Trevizo, 871 F.3d at 676. That is, the ALJ failed to "consider factors such as the length of the treating relationship, the frequency of examination, the nature and extent of the treatment relationship, or the supportability of the opinion." Id. (citation omitted).

Based on the foregoing, the ALJ failed to provide specific and legitimate reasons for discounting the June 7, 2011, and March 11, 2014, opinions of Dr. Appelbaum. Remand is warranted on this issue.

## B.    LAY WITNESS TESTIMONY

The ALJ gave the lay witness statements of plaintiff's friend, social worker, and sister "little weight":

> [T]he statements of [plaintiff], his friend, his social worker, and his sister are all vastly different from his presentation to his two treating psychiatrists. The two treating psychiatrists note consistently [plaintiff] is 'generally doing well' and that he is stable. Also, the treating psychiatrists in a great majority of the visits made no changes to his medications. It is reasonable to conclude that if [plaintiff] were as bad off as alleged he would have stronger medications and/or his medications would be adjusted more frequently to help him function better. Yet, in more than 75% of the visits, his medications remained the same. As such, the statements of [plaintiff's] friend, social worker, and sister are not consistent with the objective medical evidence of record.

[AR at 777.]

---

[9]    This included a severe impairment in the abilities to understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods; work within a schedule and maintain regular attendance and punctuality; work in coordination with and in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them; and respond appropriately to changes in the work setting. [AR at 831.]

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). A lack of support from the "overall medical evidence" is not a proper basis for disregarding a lay witness' observations. Diedrich v. Berryhill, 847 F.3d 634, 640 (9th Cir. 2017) (quoting Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009) ("Nor under our law could the ALJ discredit [the witness's] lay testimony as not supported by medical evidence in the record.")). The fact that lay testimony and third-party function reports may offer a different perspective than medical records alone "is precisely why such evidence is valuable at a hearing." Id. (citing Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996) (holding that ALJ erred where the ALJ rejected the testimony of claimant's family members about claimant's symptoms because the medical records did not corroborate those symptoms)). Thus, a lack of support from medical records is not by itself a germane reason to give "little weight" to those observations.

Additionally, as discussed above, the Court rejected the ALJ's reliance on the psychiatrists' statements that plaintiff is "stable" or "generally doing well," and on the fact that plaintiff's medications were changed at only 25% of his treatment visits. As the ALJ utilized the same reasoning to discount the statements of the lay witnesses that was rejected above, the ALJ did not provide reasons that were germane to each witness for rejecting those statements. Remand is warranted on this issue.

## C.    SUBJECTIVE SYMPTOM TESTIMONY

The ALJ summarized plaintiff's testimony and found that his statements "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. [AR at 775.] He continued:

> However at the outset and in fairness to [plaintiff], the testimony of [plaintiff] and his records corroborate the troubled life [he] has led that has left its mark and continues to impact him negatively to this day. [He] has been in and out of jail most of his life beginning in his formative years with juvenile hall matriculating to jail and then prison. Equally as ruinous is the effect of street drug[s] such as methamphetamine and others that have led to psychotic features at times. I do not desire to minimize the ruinous effects of these events and the damage done to [plaintiff's] development

mentally, emotionally and also to his body habitus.

. . . .

Throughout his treatment history, [plaintiff] also received treatment from personal service coordinators on an individual basis as well as in group therapy settings. These sessions contain notations that appear to show [plaintiff] continuing to complain of the symptoms of isolation and an inability to engage in certain basic routine chores and activities that he first presented with. [His] presentation to the personal service coordinators is different from his presentation to Drs. Applebaum [sic] and Vu. In his presentations to Drs. Applebaum [sic] and Vu it is noted that more than seventy-five percent (75%) of the visits were normal, stable, with no need to change medications to accommodate more severe symptoms. The inconsistences between the sources is significant. Yet it is reasonable to conclude that if [plaintiff] were not improving or that his symptoms were as bad as he presented to the personal service coordinators, then his psychiatrists would have recommended additional treatment modalities or his medications would have been adjusted more frequently to account for these symptoms. As discussed above, this did not happen.

. . . .

Overall, the objective medical evidence of record shows inconsistencies in [plaintiff's] presentation for treatment with his treating psychiatrists, the ones who control his medications, and other supporting treatment providers. The lack of more significant changes and the multitude of notations [he] is "doing well" or that he is stable, along with the vast majority of treatment visits resulting in no change to his medications shows his impairments are not as significant as he alleges. . . .

Furthermore [plaintiff] testified extensively and credibly at the hearing regarding his life history showing remarkable insight into his present state and assessing the impact of tremendous misfortune on his choices made when he was a young boy. Also related is the effect of having no credible mentors to guide him when he was very young and the shabby treatment received from authority figures such as teachers and the betrayal perpetrated on him by these figures leaving a deep mark of resentment and bitterness stunting his maturation to a productive young man. It is an awful story and one that causes sorrow to the listener. [Plaintiff] has had more than his share of hardship. But the story doesn't end with [him] face down in the gutter. [He] found strength and even some peace through his recent experience of, "coming to Jesus Christ through the gospel presented in the Bible." This enlightenment has given him conviction, direction, the desire to leave his old life to become new and the hope of a better future. In this endeavor he has made significant progress. He has left behind his resort to drugs to dull his mind to all of the misery. His life behind bars appears to be at an end and he is learning to adjust to freedom. In this regard he is already living a new life. I sincerely hope and pray that it continues. The thought and the vision of his success is an encouragement [to] anyone familiar with his story.

[AR at 775, 781.]

On March 28, 2016, prior to the ALJ's assessment in this case, SSR 16-3p went into effect. See SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms. Id. at *1. SSR 16-3p indicates

that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term." Id. Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation." Id.; Trevizo, 871 F.3d at 678 n.5. Thus, the adjudicator "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person." SSR 16-3p, 2016 WL 1119029, at *10. The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities." Id. at *2. The Ninth Circuit also noted that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'" Trevizo, 871 F.3d at 678 n.5 (citing SSR 16-3p).

To determine the extent to which a claimant's symptom testimony must be credited, the Ninth Circuit has "established a two-step analysis." Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)) (internal quotation marks omitted). If the claimant meets the first test, and the ALJ does not make a "finding of malingering based on affirmative evidence thereof" (Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit [her] . . . ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony about the severity of his symptoms. Trevizo, 871 F.3d at 678 (citing

Garrison, 759 F.3d at 1014-15); Treichler, 775 F.3d at 1102.

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not make a finding of malingering, the ALJ's reasons for rejecting a claimant's credibility[10] must be specific, clear and convincing. Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted). The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

Here, in discounting plaintiff's testimony, the ALJ found that his statements were inconsistent with the objective medical evidence of record, and that his statements regarding his mental health impairments to his personal service coordinators were different from his statements to Dr. Appelbaum and Dr. Vu, his treating psychiatrists.

The Court has already discussed the problems with the ALJ's findings that plaintiff's mental health treatment records show that he is "stable" or "generally doing well," and with his finding that the lay witness testimony was not supported by the objective medical evidence. Plaintiff's statements to his personal service coordinators in individual and/or group counseling sessions regarding his isolating behaviors and inability to complete certain routine chores (among other things), were not clearly inconsistent with the reports of his psychiatrists that plaintiff was

---

[10] While SSR 16-3p eliminated the use of the term "credibility," case law using that term is still instructive in the Court's analysis.

"generally doing well" or was "stable," which implies only that he has not regressed. This was not a clear and convincing reason for discounting plaintiff's testimony.

Based on the foregoing, the ALJ failed to provide clear and convincing reasons for discounting plaintiff's subjective symptom testimony. Remand is warranted on this issue.

## D.    GAF SCORES

Plaintiff suggests that the Court's previous remand order "put the ALJ on notice to consider the GAF [global assessment of functioning] score evidence that was indicative of disability." [JS at 37.] However, the Court's prior remand order found only that the ALJ's discounting of Dr. Appelbaum's opinions because his records "repeatedly" reflected a GAF score of 42 despite the evidence of "improvement" in the record, was not a specific and legitimate reason for discounting Dr. Appelbaum's opinion. [AR at 917-18.]

A GAF score is the clinician's judgment of the individual's overall level of functioning. It is rated with respect only to psychological, social, and occupational functioning, without regard to impairments in functioning due to physical or environmental limitations. Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) ("DSM-IV"). An ALJ has no obligation to credit or even consider GAF scores in the disability determination. See 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) ("The GAF scale . . . does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings."); see also Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."). The most recent edition of the DSM "dropped" the GAF scale, citing its "conceptual lack of clarity" and "questionable psychometrics in routine practice." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012).

Accordingly, the ALJ did not err in failing to address this evidence.

/

/

/

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits. <u>Trevizo</u>, 871 F.3d at 682 (citation omitted). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>Id.</u> (citing <u>Garrison</u>, 759 F.3d at 1019). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. <u>See</u> <u>Garrison</u>, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ erred in giving the greatest weight to the testifying ME and failed to provide specific and legitimate reasons for discounting the opinion of Dr. Appelbaum, the ALJ on remand shall reassess the medical opinions of record -- for the entire relevant period -- including the opinions of Dr. Appelbaum and Dr. Vu. The ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of an opinion that the ALJ discounts or rejects. Second, because the ALJ failed to provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony. The ALJ shall also reconsider the lay witness testimony of plaintiff's sister, his friend Francisco Cedillo, and his social worker and provide legally sufficient reasons germane to each witness if the ALJ determines that his or her testimony should be disregarded. Based on the ALJ's reassessment of plaintiff's subjective symptom testimony, the lay witness testimony, and the medical evidence of record, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing

in significant numbers in the national economy that plaintiff can still perform.[11]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  December 7, 2018

_____

PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[11]    Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff has no past relevant work. [AR at 781.]